## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

Civil Action No. 26-cv-3037

MINNESOTA ASSOCIATION OF RESIDENTIAL
      SERVICE HOMES (MARSH), for itself; and
SHAWN ENGMAN, individually and for and others
      similarly situated;

             *Plaintiffs*,

v.

MINNESOTA DEPARTMENT OF HUMAN
      SERVICES (DHS) and
SHIREEN GANDHI, individually;

             *Defendants*.

---

## FIRST AMENDED CLASS ACTION COMPLAINT AND REQUEST
## FOR INJUNCTIVE AND DECLARATORY RELIEF

---

Plaintiffs MINNESOTA ASSOCIATION OF RESIDENTIAL SERVICE HOMES (MARSH), for itself, and Shawn ENGMAN, individually and for others similarly situated, submit as and for their Complaint against Defendants, based on personal knowledge and upon information and belief as follows:

### INTRODUCTION

1.      In the early 2000s, the State of Minnesota was increasingly targeted by allegations that it was systematically violating the human rights of vulnerable adults by placing them in overly institutionalized settings. In response, the legislature in 2009 enacted a statutory preference known for placement of vulnerable adults in family-like environments known as the "group-home moratorium." This public-policy preference for family-like environments was buttressed in 2014

when the State of Minnesota entered into a settlement agreement to resolve a federal lawsuit known as the "*Jensen* settlement."  The *Jensen* settlement required the State of Minnesota to adopt policies that required vulnerable adults to be placed in the least-restrictive settings that would serve their individual needs.  The State of Minnesota also committed to developing "person-centered" services plans for vulnerable adults that would give each vulnerable adult a substantial voice in selecting their placement.

2.      The group-home moratorium and the *Jensen* settlement resulted in a dramatic increase in the number of family adult foster care (AFC) homes licensed under Chapter 245A of Minnesota Statutes, which required that license-holders maintain the licensed facility as their primary residence and that the license-holders be the primary caregivers within their facility. Many AFCs were also licensed to provide family residential services (FRS), which included provision of home- and community-based services (HCBS) eligible for reimbursement using Medicaid funds.  Such services are often referred to as "waivered services."

3.      The *Jensen* settlement provided for a ten-year period during which the federal district court would monitor Minnesota's compliance with the terms of the *Jensen* settlement.

4.      After the court monitoring period expired in 2021, the Minnesota Department of Human Services (DHS) initiated a campaign of aggressive licensing enforcement against FRS operators in Minnesota, seeking to enforce new requirements for FRS providers that would render it unpleasant or impossible for FRS providers to continue operating their businesses.

5.      Starting in 2026, the State of Minnesota imposed what became known as the "flat-rate system" on FRS providers.  The flat-rate system sought to decrease the reimbursement rates paid to FRS providers while providing greater reimbursement rates to non-FRS providers.  The flat-rate system also barred FRS providers from obtaining rate exceptions that would improve the

2

rates they could receive.  DHS also worked to impose other ad hoc restrictions on FRS providers. The "flat-rate system" and other measures taken by DHS had the intended effect of rendering FRS unviable as a business model.

6.      In sum, starting as soon as court monitoring was lifted in 2021, DHS has pursued a deliberate campaign to sabotage FRS providers, to escape the restrictions of the *Jensen* settlement and to force vulnerable adults into more institutionalized settings preferred by DHS.

## PARTIES

7.      Plaintiff MINNESOTA ASSOCIATION OF RESIDENTIAL SERVICE HOMES (MARSH) is a nonprofit business association representing family residential services (FRS) providers in Minnesota.

8.      Plaintiff Shawn ENGMAN is a resident of the state of Minnesota.

9.      ENGMAN is a vulnerable adult and a disabled adult within the meaning of Section 504 of the Rehabilitation Act, the Americans with Disabilities Act, and the Medicaid Act.

10.      Defendant Shireen GANDHI is the commissioner of the MINNESOTA DEPARTMENT OF HUMAN SERVICES and is sued in her individual capacity.

11.      Defendant MINNESOTA DEPARTMENT OF HUMAN SERVICES (DHS) is an administrative agency of the State of Minnesota.

## CLASS ACTION ALLEGATIONS

12.      Plaintiff ENGMAN seeks to represent a Class pursuant to Rule 23 of the Federal Rules of Civil Procedure.

13.      Putative Class Members:

> A. Class Members (Class) consist of vulnerable adults intended as
>    beneficiaries of the *Jensen* settlement agreement who chose to be placed in

adult-foster-care (AFC) settings and were approved to receive family residential services (FRS) in those settings.

B. The Class Period is the date of the *Jensen* settlement agreement through the date of filing of this Complaint (Class Period).

C. The Class is so numerous that joinder of all members is impractical.

D. The Class is ascertainable, as the names of all Class Members can be identified in business records maintained by Defendants.

E. Defendants have acted or refused to act on grounds generally applicable to the Class, thereby Making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class.

F. Class Plaintiff will fairly and adequately protect the interests of the Class and have no interests adverse to or which directly and irrevocably conflict with the interests of other Class Members.

G. Class Plaintiff is represented by counsel competent in the litigation of claims of the type asserted herein.

H. Questions of law and fact common to the Class predominate over questions affecting only individual Class Members. Such common questions include, but are not limited to, the following:

  i. Whether Defendants' acts and/or omissions violate provisions of the *Jensen* settlement agreement that were specifically intended to benefit Class Members.

  ii. Whether Defendants' acts and/or omissions violates the United States Constitution.

iii. Whether Defendants' acts and/or omissions violate Section 504 of the Rehabilitation Act.

iv. Whether Defendants' acts and/or omissions violate Title II of the Americans with Disabilities Act.

v. Whether Defendants' acts and/or omissions violate 42 U.S.C. § 1396a.

vi. Whether Defendants' acts and/or omissions violate 42 C.F.R. § 482.13.

vii. Whether Defendants' acts and/or omissions alleged herein violate Minn. Stat. § 245A.04, subd. 6.

I. ENGMAN's claims are typical of Class Members because they arise from the same policies and practices of Defendants, and because Defendants have acted in the same way towards ENGMAN and the Class Members.

J. Defendants" actions and/or omissions toward the Class are identical or substantially similar, and arise out of a policy, procedure and common course of wrongful conduct of intentionally abandoning the *Jensen* settlement agreement and/or refusing to comply with the *Jensen* settlement agreement.

K. Class Plaintiff will fairly and adequately protect the interests of the members of the Class. Class Plaintiff is committed to the vigorous prosecution of this action, have retained competent counsel, and have no interests antagonistic to or in conflict with those of the Class. As such, Class Plaintiff is an adequate class representative.

5

L.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Class treatment will permit a large number of similarly situated persons to prosecute their claims in a single forum simultaneously and without unnecessary duplication and effort that would result from numerous individual actions.

M.  Individual litigation of the facts of all the individual cases would unduly burden the courts. Individual litigation would further present a potential for inconsistent or contradictory judgments and would increase the delay and expense to all parties and the Court system. Further, the expense and burden of individual litigation make it impossible for Class Members to individually redress the wrongs alleged herein. In contrast, a class action presents far fewer management difficulties and provides the benefit of single adjudication under the comprehensive supervision of a single court. Notice of pendency of the action and any resolution thereof can be provided to proposed class members by publication and/or other means.

N.  This action is maintainable as a class action under Rule 23(b)(2) since the unlawful actions of Defendants, as alleged herein, have been taken on grounds equally applicable to all members of the Class, thereby Making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

O.  This action is also maintainable as a class action under Rule 23(b)(3), as common questions of law and fact described above predominate over any questions affecting only individual members, the desirability of

6

concentrating the claims in one forum, individual class members lack the resources to bring individual actions, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

P.  All allegations and claims are pleaded in the alternative to the extent required for proper construction under applicable state or federal law.

## JURISDICTION AND VENUE

14.    This Court has federal question jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and related law and has original jurisdiction over this matter pursuant to 28 U.S.C. § 1343(a)(3). Plaintiffs have commenced this action pursuant to 42 U.S.C. § 1983, Title II of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, and related federal laws to recover damages, including the costs of this suit and reasonable attorney's fees sustained by Plaintiffs and the Class Members by reason of Defendants' violations of federal law and for injunctive relief as more fully set forth herein.

15.    This Court has supplemental jurisdiction over the claims in this Complaint that arise under state law pursuant to 28 U.S.C. § 1367(a) because the state law claims are so related to the federal claims that they form part of the same case or controversy and derive from a common nucleus of operative facts.

16.    Venue in the District of Minnesota is appropriate pursuant to 28 U.S.C. § 1391, as the conduct alleged herein occurred in this District.

17.    Non-party Evan O'Connor brings this suit on behalf of ENGMAN under the authority of Minnesota Statutes, section 540.08 and Federal Rule of Civil Procedure 17(c) because he is ENGMAN's guardian.

7

## GENERAL ALLEGATIONS

### The *Jensen* Settlement and the *Olmstead* Plan

18.     In June 2011, DHS entered into a settlement agreement in *Jensen, et al. v. Minnesota Dept. of Hum. Servs.*, court file no. 09-cv-1775, a federal class-action lawsuit alleging that DHS had violated the Americans with Disabilities Act by forcing vulnerable adults into overly institutionalized settings that used "seclusion and mechanical restraints," in violation of residents' rights.  *See* 09-cv-1775, ECF No. 136-1, at 2.

19.     The terms of the *Jensen* settlement agreement also required that Minnesota comply with the United States Supreme Court's holdings is *Olmstead v. L.C.*, 527 U.S. 581 (1999) by establishing an "*Olmstead* Planning Committee" to ensure Minnesota's compliance with the United States Supreme Court's holding in and, using the recommendations of that committee, "develop and implement a comprehensive *Olmstead* plan that uses measurable goals to increase the number of people with disabilities receiving services that best meet their individual needs and in the 'Most Integrated Setting.'"  *See id.* at 18; *see also id.* at 19 (requiring creation of an "Advisory Committee . . . to study, review and advise [DHS] on how to . . . reflect current best practices, including . . . the development of placement plans consistent with the principle of the 'most integrated setting'").

*20.*     The *Jensen* settlement specifically required that Minnesota "undertake best efforts to ensure that each resident is served in the most integrated setting appropriate to meet such person's individualized needs, including home or community settings."  *See id.* at 13-14; *see also id.* at 16 (requiring "the provision of assessment, triage, and care coordination to assure persons with developmental disabilities receive the appropriate level of care at the right time, in the right place, and in the most integrated setting in accordance with the U.S. Supreme Court decision in

*Olmstead*"); *see also* 28 C.F.R. 35.130(d) ("A public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities.").

21.     The term "integrated setting" refers to settings that are within the community, reflecting a preference for minimizing the institutional character of residential placements for vulnerable adults.  *See* 28 C.F.R. § Pt. 35, App. B (defining "most integrated setting" as the location that "enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible").

22.     The *Jensen* settlement also required that Minnesota ensure that facilities housing vulnerable adults "utilize person centered planning principles and positive behavioral supports." *See* 09-cv-1775, ECF No. 136-1, at 11. The "person centered planning principles" requirement meant that Minnesota was required to affirmatively seek out information from each vulnerable adult to identify their "specific interests, goals, likes and dislikes, abilities and strengths, as well as support needs."  *See id.* at 13.  The state was required to give each vulnerable adult "the opportunity to express a choice regarding preferred activities that contribute to a quality life." *See id.* at 13-14.  And the state was required to "undertake best efforts to provide each resident with reasonable placement alternatives." *See id.* at 14.

23.     Federal guidance implementing *Olmstead* joined the "most integrated setting" and "person centered planning principles" requirements by specifically stating that the "most integrated setting" requirement included the requirement that "persons with disabilities must be provided the option of declining to accept a particular accommodation."  28 C.F.R. § Pt. 35, App. B.

24.     Pursuant to its obligations under the *Jensen* settlement agreement, the State of Minnesota enacted what is commonly known the "*Olmstead* plan," focused on empowering adults with disabilities to "decide for themselves where they will live, learn, work, and conduct their lives." *Jensen v. Minnesota Dep't of Hum. Servs.*, 138 F. Supp. 3d 1068, 1075 (D. Minn. 2015).

**Minnesota's Implementation of the *Jensen* Settlement and the *Olmstead* Plan**

25.     In the aftermath of the *Jensen* settlement, Minnesota moved to codify its obligations in statute.  Specifically, Minnesota implemented the requirement that vulnerable adults be housed in the most integrated setting by implementing a "licensing moratorium," requiring that DHS (with limited exceptions) refrain from issuing new licenses to "corporate" homes where the license-holder did not reside at the home.   *See* Minn. Stat. § 245A.03, subd. 7(a).

26.     Under the moratorium, services for vulnerable adults eligible for Medicaid waiver programs would be preferentially provided as "family residential services (FRS)," in facilities licensed to provide adult foster-care (AFC) services under Chapter 245A and where the license-holder either held an additional license to provide home- and community-based services (HCBS) under Chapter 245D or operated as a "host home" under the supervision of an outside HCBS license-holder.

27.     "'Adult foster care' means the provision of food, lodging, protection, supervision, and household services to a functionally impaired adult in a residence and may also include the provision of personal care, household and living skills assistance or training, medication assistance under part 9555.6225, subpart 8, and assistance safeguarding cash resources under part 9555.6265." Minn. R. 9555.5105, subpt. 3.

10

28.     "'Adult foster care services' means those community social services that are provided to residents or prospective residents of adult foster homes."  Minn. R. 9555.5105, subpt. 4.

29.     "Adult foster home" means a residence operated by an operator who, for financial gain or otherwise, provides 24-hour foster care to no more than four functionally impaired residents and a resident with five or six residents as authorized under Minnesota Statutes, section 245A.11, subdivision 2a."  Minn. R. 9555.5105, subpt. 5.

30.     "Family residential services" (FRS) are services funded by the State of Minnesota using federal Medicaid funds "as defined in the brain injury, community alternative care, community access for disability inclusion, and developmental disabilities waiver plans.  *See* Minn. Stat. § 245D.03, subd. 1(c)(3)(iv).  FRS services for vulnerable adults differ from community residential services (CRS) in that FRS services are provided exclusively in an AFC setting while CRS services can be provided in other types of facilities not subject to the residency and other restrictions placed on AFC facilities.  *Compare id.*, *with id.*, subd. 1(c)(3)(iii); *see also* Minn. Stat. § 245A.02, subd. 6f (requiring AFC license-holders to maintain the AFC as their "primary residence" and be the "primary caregiver" at the AFC facility).

31.     In 2021, the legislature incorporated the "primary residence" requirement into the definition of "family adult foster care," adding an additional requirement that AFC license-holders were also required to be the "primary caregiver."  *See* Laws 2021, c.7, art. 13, § 4 (codified at Minn. Stat. § 245A.02, subd. 6f).

32.     In its *Olmstead* plan, Minnesota recognized the obligations imposed by the requirements for "person-centered planning" as "government and service providers begin by listening to individuals about what is important to them in creating or maintaining a personally

11

valued, community life.  Planning of supports and services is not driven or limited by professional opinion or available services options but focused on the person's preferences and whole life context." *Putting the Promise of Olmstead into Practice: Minnesota's Olmstead Plan* (Apr. 2022 rev.), https://mn.gov/olmstead/assets/2022-04-olmstead-plan_tcm1143-526399.pdf (hereinafter 2022 *Olmstead* Plan), at 33.

33.     Minnesota also moved to specifically codify its obligations to focus on person-centered care planning, including the requirements to consider patients' interests.  Specifically, Minnesota codified the person-centered-planning language from the *Jensen* settlement into statute. Minn. Stat. § 256B.0911, subd. 10(l) ("'Person-centered planning' is a process that includes the active participation of a person in the planning of the person's services, including in Making meaningful and informed choices about the person's own goals, talents, and objectives, as well as Making meaningful and informed choices about the services the person receives, the settings in which the person receives the services, and the setting in which the person lives.").  Minnesota also required that DHS give service recipients a substantive voice in choosing their own placements from among the available alternatives.  *See, e.g.*, Minn. Stat. Ann. §§ 245D.07, subd. 1a(a) ("The license holder must provide services in response to the person's identified needs, interests, preferences, and desired outcomes."); 256B.4905, subd. 2a (mandating that vulnerable adults be permitted to make an "informed choice" about their placements).  And Minnesota enacted a requirement that DHS specifically solicit and consider vulnerable adults' input before revoking AFC or HCBS licenses.  *See* Minn. Stat. § 245A.04, subd. 6(a) ("Before issuing, denying, suspending, revoking, or Making conditional a license, the commissioner shall evaluate information gathered under this section [including] the well-being of persons served by the program [and] available evaluations of the program by persons receiving services.").  DHS was

also required to consult with "persons and relatives of persons using the program governed by the rule . . . and representatives of license holders affected by the rule" when developing administrative rules for FRS facilities. *See* Minn. Stat. § 245A.09, subd. 6.

34.     Recognizing that many among the new group of FRS providers might be unfamiliar with the intricacies of documentation requirements for provision of HCBS services, Minnesota enacted a specific statutory provisions that required DHS to provide assistance to new FRS providers by "providing technical assistance on how to attain and maintain compliance with the applicable law or rules governing the provision of home and community-based services" during the first licensing review for each FRS provider. Minn. Stat. § 245A.042, subd. 3(c)(1) (2014).

**DHS's Campaign to Destroy FRS Facilities After *Jensen* Monitoring Ended**

35.     Pursuant to the *Jensen* settlement, the federal district court retained jurisdiction to monitor Minnesota's compliance for an initial two-year period that was repeatedly extended over Minnesota's objections. *See, e.g.*, court file no. 09-cv-1775, ECF No. 638 (overruling Minnesota's objection to extension of the Court's supervisory jurisdiction)   The Court ended its supervisory jurisdiction on October 24, 2020 and the reviewer appointed by the Court to oversee Minnesota's compliance with the *Jensen* settlement and its implementation of the *Olmstead* plan was released on December 17, 2020. *See* court file no. 09-cv-1775, ECF Nos. 879, 904.

36.     Almost immediately after *Jensen* monitoring ended, DHS initiated an aggressive licensing campaign against FRS providers. The licensing-enforcement campaign purported to be an attempt to enforce the spirit of the *Jensen* settlement by requiring that vulnerable adults be cared for in the most "family-like" environment possible. But taken as a whole, DHS's licensing campaign and economic campaign against FRS providers ultimately revealed that the real purpose

was to destroy the FRS system required by the *Jensen* settlement and the *Olmstead* Plan by rendering AFC/FRS facilities unviable.

37.     DHS's campaign against FRS providers began in early 2021, immediately after the expiration of the *Jensen* settlement monitoring period, with a letter sent to county DHS licensors. The letter contained a list of previously unannounced criteria that DHS instructed its licensors to use to detect violations of the "primary residence" and "primary caregiver" requirements for adult-foster-care homes.  Tellingly, DHS's investigatory criteria were not sent to license-holders the license-holders themselves.

38.     In August 2023, after its licensing campaign was already well underway, a DHS licensing supervisor sent a letter to all AFC providers, which by definition also included all FRS providers, informing them of DHS's "expectations" for their compliance with the "primary residence" and "primary caregiver" requirements.  Tellingly, the letter directly stated that FRS facilities were *not* intended to be business ventures, notwithstanding a specific DHS rule stating otherwise.  *See* Minn. R. 9555.5105, subpt. 5 (permitting AFC operators to function "for financial gain or otherwise").  DHS thus telegraphed what would later become its economic campaign against FRS license-holders.

39.     Using its selectively investigated criteria for defining "primary residence" and "primary caregiver," DHS revoked numerous AFC/FRS licenses during 2022 and 2023.  DHS abandoned its normal practice of leaving AFC licensing investigations to local licensors and instead identifying targets for investigation directly from DHS headquarters in Saint Paul.  The targeting lists were accompanied by directives that the investigators find cause for license revocation by selectively investigating DHS's list of criteria such as to exclusively focus on factors that would support the conclusion that the license-holder had violated the "primary residence" or

"primary caregiver" requirement.   DHS thus created a "gotcha game" where FRS license-holders could be stripped of their licenses for any violations of DHS's criteria, without prior awareness among the license-holders regarding what the criteria were and even if the license-holders met some or all of the criteria that DHS did not choose to investigate.

40.     Upon information and belief, DHS instructed its investigators to avoid complying with gathering the information required by Minn. Stat. § 245A.04, subd. 6, in order to reserve for DHS licensing overseers the ability to testify about the nature of FRS residents' interests and preferences without the complication of encouraging the residents to speak for themselves.  The inference that this was DHS' intention is supported by the fact that DHS licensing officials implicitly claimed this authority in practice by providing testimony about their personal opinions of AFC/FRS residents' best interests in several administrative proceedings where DHS had failed to make any efforts to inquire as to  AFC/FRS residents' or their family members' opinions about proposed license-revocations.

41.     Upon information and belief, DHS also instructed its investigators to refrain from complying with its statutory obligation to provide technical assistance to FRS providers during their first licensing review.  *See* Minn. Stat. § 245A.042, subd. 3(c)(1) (2014).  Instead, investigators were instructed to *actively avoid* giving technical assistance even for minor violations and to instead compile such violations into lengthy lists to justify license-revocation.  At DHS's request, the Minnesota legislature removed the technical-assistance requirement entirely in 2025. *See* Minn. Laws 2025, c. 38, art. 5, § 34 (repealing Minn. Stat. § 245A.042, subd. 3).

42.     DHS also tried to suppress focus on vulnerable adults' preferences by coercing local licensors and case workers.  Upon information and belief, a local AFC licensor who testified during an FRS license-holder's appeal that closure of the targeted facility would not be in the best

interests of its residents was threatened with disciplinary actions and instructed to adopt a more adversarial position towards AFC/FRS providers in the future. At another administrative proceeding, the local licensor called by DHS to testify against the FRS license-holder encountered the FRS provider in the hallway and told them, "I'm sorry, they made me do this." And on information and belief, DHS issued guidance to all licensors and case workers statewide discouraging them from testifying on behalf of FRS license-holders and requiring that they obtain approval from DHS before providing any such testimony.

43.    DHS's final decisions demonstrated that DHS was institutionally hostile to AFC/FRS providers and was predetermined to shut down as many programs as possible. In every single case where AFC/FRS license-holders successfully persuaded administrative law judges (ALJs) to recommend a lesser sanction that license-revocation, the DHS Commissioner not only overruled the ALJ but did so on *precisely* the same grounds sought by its licensors. And in every single case where AFC/FRS license-holders successfully showed that DHS had failed to comply with its obligation to consider its obligation to consider residents' own preferences and interests, the DHS Commissioner sought to cover-up these violations by either quietly removing those ALJ findings from DHS's final decisions or by citing the personal opinions of DHS's own licensors as sufficient to describe the residents' interests.

44.    DHS showed open disdain for AFC/FRS residents' preferences in the manner in which it enforced its license-revocation decisions. After DHS revoked AFC/FRS licenses purportedly out of respect for their gains under the *Jensen* settlement and without even asking them their opinions, DHS ignored entreaties from residents that DHS reconsider its license-revocation decisions. Residents in AFC/FRS providers targeted for license-revocation by DHS were summarily removed by county social workers operating on strict instructions from state DHS

and were not given any say in the timing of their removal or in the initial alternative placements they were forced into.

45.     DHS also exercised its licensing authority to suppress the creation of new AFC/FRS facilities.  Specifically, even as county social workers struggled to find placements for many AFC/FRS recipients, DHS directed many local licensors to refuse to process applications for new AFC facilities.  DHS also refused to allocate sufficient resources to process HCBS license applications, resulting in wait periods routinely exceeding 3 years.  And in late 2025, DHS implemented a moratorium on processing HCBS licensing applications entirely.

46.     DHS's licensing campaign against AFC/FRS providers also operated at a lower level, using correction orders (which are not appealable but which can be enforced by subsequent license-revocation proceedings) to order that AFC/FRS providers implement expensive and difficult rules for internal physical configuration of AFC/FRS facilities.  DHS's directives were issued not only without consulting the residents of the affected AFC/FRS facilities, but often against those residents' express wishes.  For example, one provider was prohibited from installing a commonly used device for limiting the movements of pets within the home even though the residents actively wanted the device to be used.

47.     DHS's various licensing campaigns sowed widespread fear and uncertainty among AFC/FRS providers, reducing the number of FRS beds available statewide.  Many county social workers began to experience increasing difficulty finding AFC/FRS placements due to decreasing availability of providers.

48.     AFC/FRS providers reacted to DHS's licensing campaign by forming the MINNESOTA ASSOCIATION OF RESIDENTIAL SERVICE HOMES (MARSH), a business

17

association of AFC/FRS providers, to provide assistance to AFC/FRS providers and to lobby the Minnesota legislature.

49.     DHS reacted to the formation of MARSH with open hostility, condemning MARSH in a court filing as a sham organization formed "for the sole purpose of challenging DHS policies and proposals."  Some DHS officials also sought to target persons who they believed to be the founders of MARSH for retaliation by discouraging county social services agencies from contracting with those persons and by targeting those persons for special licensing inspections.  On information and belief, these officials were motivated by a desire to spread fear among AFC/FRS providers and suppress resistance to DHS's campaigns against AFC/FRS providers.

50.     DHS supplemented its licensing campaign against FRS providers with an economic campaign.  Initially, DHS's economic campaign grew out of its licensing actions based on the "primary caregiver" requirement for FRS providers.  Specifically, DHS defined the "primary caregiver" mandate to require that FRS providers *personally* provide "a majority" of all care in their FRS home, heavily limiting the supplemental use of staff, including even assistance by other family members.  Since FRS services by definition include 24-hour supervision, (CITE) DHS's requirement means that FRS providers are effectively prohibited from obtaining outside employment, rendering FRS providers entirely dependent on reimbursement for FRS services as their sole means of income.

51.     DHS has also interpreted the "primary caregiver" requirement to limit the number of residents in each FRS facility to the number that can be personally served by one person, the license-holder, notwithstanding the express statutory provisions that not only allowed but *required* that HCBS services be supported by staffing levels that included individuals in addition to the individual license-holder.  *See* Minn. Stat. § 245D.09.  DHS's definition also departed from DHS's

18

own definition of "primary caregiver" in the HCBS context.  Minn. R. 9525.1800, subpt. 20 (defining "primary caregiver" as "a person other than a member of the person's family who has primary responsibility for the assistance, supervision, or training of the person in the person's residence").  But pursuant to its idiosyncratic redefinition of "primary caregiver," DHS has reduced the authorized capacity of some FRS providers far below the statutory 4-bed limit, *see* Minn. Stat. § 245A.11, subd. 2a; thus imposing a drastic limit on income available to FRS providers.

52.     DHS further limited the income available to AFC/FRS providers by refusing to reimburse them for all the hours the providers are required by licensing statutes to work.  Prior to 2026, FRS reimbursement rates were required to be set using the disability-waiver rate system (DWRS) detailed in Minn. Stat. § 256B.4914.  The DWRS system required that AFC/FRS reimbursements be set at a daily rate that included detailed hourly calculations based on salary comparisons for staff members performing similar functions in private settings.  *See* Minn. Stat. § 256B.4914, subd. 6b.  In fact, the DWRS system expressly provided for a system of exceptions that allowed providers to request higher reimbursement rates for residents that had particularly high needs that required greater staffing levels.  *See id.*, subd. 14. But DHS's "primary caregiver" requirement meant that AFC/FRS providers were essentially prohibited from using staff.  In fact, DHS licensors routinely used the mere existence of shift staff as an indication of a licensing violation, creating a powerful disincentive for AFC/FRS providers to consider hiring staff or from accepting residents that might require care in excess of that possible for the individual license-holder acting alone.

53.     DHS further reduced reimbursements available under the DWRS system by simply refusing to reimburse many of the hours that AFC/FRS providers were required to work.

19

Specifically, DHS imposed rate-calculation policies that limited AFC/FRS providers' reimbursement entitlement to the number of hours the providers spent engaged in face-to-face services, withholding reimbursement for hours that AFC/FRS providers are required to be at the residence providing services that do not require face-to-face contact, such as cleaning and maintenance, as well as for hours where the AFC/FRS providers are required to be available but where their residents are at work or engaging in community activities. *See* Minn. R. 9555.5105, subpt. 5 (requiring AFC providers to provide "24-hour foster care"); *see also* Minn. Stat. §§ 245D.03, subd. 1(b)(4) (requiring FRS providers even at the "basic" level to provide "24-hour emergency assistance [and] personal emergency response"); 245D.02, subd. 33b(b) (requiring that supervision be provided during "any period of time during which the license-holder will seek reimbursement for services"); Minn. R. 9555.5105, subpt. 37(B) (defining "supervision" to include the presence of the license-holder "in the residence during normal sleeping hours").

54. DHS in some cases even refused to provide reimbursement for overnight supervision even though license-holders are required to be present in the AFC/FRS home overnight and statute expressly required reimbursement for overnight supervision. *See* Minn. Stat. § 256B.4914, subd. 5a(4) (Supp. 2021). In 2025, at DHS's request, the legislature codified this work-without-pay requirement by removing the statutory requirement for overnight reimbursement while leaving in place the statutory requirements that AFC/FRS providers be present at the AFC/FRS facility 24 hours a day and seven days a week, including overnights.

55. In 2024, DHS's coup-de-gras against the FRS system appeared in the form of a proposal to replace DWRS rates for FRS reimbursement with a "flat-rate system" upon receipt of federal approval. *See* Minn. Stat. § 256B.4914, subd. 19. In fact, DHS attempted unsuccessfully to implement the flat-rate system even before receiving federal approval, backing off only after a

coalition of FRS service providers sued for court intervention. *See Minn. Assn. of Residential Serv. Homes v. Dept. of Hum. Servs.*, court file no. 62-CV-26-447. DHS did not seek input from vulnerable adults served by FRS facilities before transitioning to the flat-rate system.

56.     Minnesota received federal approval for the flat-rate system in 2026. Under the flat-rate system, FRS reimbursement rates are set at a lower rate than FRS providers received under DWRS. *Compare* Minn. Stat. § 256B.4914, subd. 6 (setting rates for so-called "corporate" group homes), *with id.*, subd. 6b (setting lower rates for FRS providers). Additionally, FRS providers would automatically receive 10% less than other providers providing similar services. *See* Minn. Stat. § 256B.4914, subd. 19. And FRS would no longer be eligible to receive exception rates for vulnerable adults with particularly high needs. *See* Minn. Stat. § 256B.4914, subds. 14(m), 14a.

57.     As a result of the transition to the flat-rate system and DHS's other economic actions against AFC/FRS providers, the FRS model simply became economically unviable, FRS facilities are being forced to either terminate or limit their services, and the vulnerable adults that FRS facilities serve face a rapidly diminishing availability of the "family-like" integrated community placements required by the *Jensen* settlement agreement.

58.     Due to the forced closure or restructuring of FRS facilities, many vulnerable adults are being forced out of the FRS placements they have grown to identify as their homes without DHS's prior consideration of their individual wants, needs, or desires.

59.     DHS has also begun to target individual residents in its campaign to remove FRS facilities from the placements available to them. Plaintiff Shawn ENGMAN is an example. ENGMAN is a vulnerable adult that has, since 2019, received FRS services at Strasser Family Foster Services (SFFS) in Dakota County, Minnesota. In keeping with what DHS has stated is the

purpose of AFC/FRS settings, ENGMAN has grown to feel that SFFS is his home and the other residents at the facility, including the facility owner, are akin to his family members.

60.     On February 24, 2026, ENGMAN was diagnosed with complex central sleep apnea, which required treatment with an adaptive supportive ventilation machine.  To use the machine, however, ENGMAN required 24/7 1:1 staffing with nursing oversight level for the duration of the treatment period, an increase over the 13-hour-per-day 1:1 staffing without nurse oversight that was approved as part of his FRS services.

61.     Under the new "flat-rate" system imposed by DHS, ENGMAN could not receive this level of services as part of FRS services because the daily reimbursement rate set by DHS for ENGMAN did not allow SFFS to hire the necessary support staff and because DHS had declared that rate exceptions due to circumstances like ENGMAN's would not be permitted in FRS settings under the flat-rate system.

62.     With the assistance of a Dakota County case manager, ENGMAN was approved for crisis respite services through September 28, 2026, which would allow him to be eligible for a greater reimbursement rate that would allow for the increased staffing while also allowing ENGMAN to stay in what he perceived as his home until such time as he could be stabilized, which ENGMAN's doctors thought could be evaluated by August 4, 2026.

63.     Under Minn. Stat. § 245D.03, subd. 1(c) and corresponding DHS guidance, ENGMAN was eligible to receive the crisis respite services initially approved by Dakota County. In fact, honoring a vulnerable adult's desire to remain in their home and avoid institutionalization is an express purpose of crisis respite services stated in DHS's own guidance.  *See* Crisis Respite, http://www.dhs.state.mn.us/main/idcplg?IdcService=GET_FILE&RevisionSelectionMethod=Lat estReleased&Rendition=Primary&allowInterrupt=1&noSaveAs=1&dDocName=dhs16_196300

22

(defining crisis respite to include "[s]pecific behavioral or medical intervention strategies to meet the person's crisis-related needs"); *see also* Minn. Stat. § 256B.4914, subd. 14a(b) (expressly permitting rate exceptions for FRS providers providing crisis respite services).

64.     In a perversion of her role as "person-centered transition coordinator" at state DHS headquarters, a DHS official, Amber Maki, overruled the Dakota County case worker, declaring that, in her personal opinion, crisis respite services for ENGMAN was an unwise use of Medicaid funds.  Accordingly, Maki ordered that Dakota County remove ENGMAN from his home by June 29, 2026.  On information and belief, Maki also threatened the Dakota County case worker with a fraud investigation to force her to stop advocating on ENGMAN's behalf, even though post-*Jensen* Minnesota statutes expressly require that case workers exercise their professional judgment in support of the vulnerable adults they serve.  *See, e.g.*, Minn. Stat. §§ 256B.092, subd. 1a(a)(1) (requiring case managers to develop a "person-centered support plan" for each service recipient); 256B.49, subd. 13(b) (prohibiting case managers from delegating "aspects [of their duties] that require professional judgment including [] finalizing the person-centered support plan").

65.     On May 22, 2026, at Maki's direction, the Dakota County case worker issued a "Long-Term Services and Supports—Notice of Action," advancing the date of ENGMAN's forced termination of crisis respite services and resulting forced relocation to May 31, 2026.  The notice falsely stated that ENGMAN was ineligible for crisis respite services because "[c]risis respite services are intended to provide relief to the caregiver."

66.     Maki indicated informally that ENGMAN could receive the services he needed in an institutional hospital setting rather than an FRS setting like SFFS, indicating that her objection was not to ENGMAN's eligibility for services themselves but instead her preference that those services be provided in an institutional setting rather than an FRS setting.  Maki's determination

23

thus directly contradicted Minnesota's *Olmstead* plan and, by extension, the *Jensen* settlement. *See* 2022 Olmstead Plan at 83 (stating the purpose of "crisis services" as "[w]hen people with disabilities experience a crisis, it is important that they experience as little disruption in their living situation as possible and avoid unnecessary stays in institutional settings").

67. DHS subsequently ratified Maki's determination, issuing ENGMAN a notice of service denial based on an identical misrepresentation of the nature of crisis respite services. On information and belief, DHS's true motive in terminating ENGMAN's crisis-respite service was to further narrow the range of services available in FRS settings and to perpetuate the economic unviability of FRS services, without regard to ENGMAN's individual goals, needs, or desires.

68. ENGMAN submitted an administrative appeal and DHS stayed ENGMAN's forced removal until September 28, 2026 or the denial of ENGMAN's appeal, whichever comes first. But DHS's lengthy record of hostility to FRS providers and the fact that it has already formally endorsed Maki's opinion justifies the inference that ENGMAN's administrative appeal is likely to be hopeless, notwithstanding DHS's statutory violations.

69. At no point in Maki's or DHS's decisions to deny ENGMAN crisis-respite services at SFFS did Maki or any other DHS official seek ENGMAN's input as to his specific interests, goals, likes and dislikes nor did it offer him an informed choice in where those services would be provided, as required by the *Jensen* settlement and the *Olmstead* plan. Instead, Maki and DHS prioritized DHS's post-*Jensen*-monitoring disfavor towards FRS providers over its obligations to give ENGMAN any voice in choosing the setting at which he would receive services.

70. The effect of DHS's disregard of ENGMAN's interests is that ENGMAN faces imminent threat of being rendered unable to receive services at the facility he has chosen—an FRS facility he views as his home—and will instead be forced into an institutional setting chosen by

24

DHS, all without prior consultation with or participation by ENGMAN. This violates DHS's obligations under the *Jensen* settlement, the *Olmsted* Plan, and Minn. Stat. § 256B.49 and Minn. Stat. § 256B.0911.

### DHS's Campaign to Destroy FRS Facilities Is Ongoing

71. In the aftermath of the widely publicized fraud allegations related to child-care facilities in Minnesota, DHS moved to exploit the allegations to further escalate its war on AFC/FRS providers. Specifically, DHS used a federal requirement that it review health-care programs deemed to be "high-risk" to abruptly and without prior notice strip eligibility for Medicaid reimbursement from numerous AFC/FRS providers. DHS's pretexts for stripping these providers of their reimbursement eligibility was often entirely unrelated to any allegations of fraud and relied instead on yet another unpublicized requirement that AFC/FRS providers be personally present at the AFC/FRS facility within 30 minutes of an unannounced visit by an DHS investigator.

72. Other AFC/FRS providers threatened with a purported "revalidation" were forced to reduce the scope of their available services in order to avoid the "high-risk" categorization and resulting risk to arbitrary loss of their reimbursement eligibility.

73. The result of DHS's misuse of its "high-risk" revalidation authority has been to further reduce the availability of "family-like" community placement options for vulnerable adults. DHS did not consult with the vulnerable adults affected by the loss of reimbursement eligibility before implementing the results of its purported review of supposed "high-risk" programs.

74. AFC/FRS service recipients affected by the abrupt loss of reimbursement eligibility for their providers also face imminent danger of loss of their placements in the community since few providers can continue to provide services in the absence of reimbursements, especially in

25

light of the outside-employment restrictions imposed by DHS under its idiosyncratic "primary caregiver" requirement.

75.     Although AFC/FRS providers who are stripped of their reimbursement eligibility are permitted to appeal, their ability to do so is heavily burdened by the fact that they may lack the resources to do so after reimbursement eligibility is cut off.  Even if they do appeal, DHS's now-lengthy history of hostility towards AFC/FRS providers renders such appeals to likely be hopeless.

76.     DHS also continues to press the Minnesota legislature for further statutory changes that will facilitate its abandonment of its obligations under the *Jensen* settlement, including proposals to place county case managers and licensors under direct DHS control, justifying the inference that DHS will continue to violate the *Jensen* settlement agreement absent ongoing monitoring.

## CLAIMS FOR RELIEF

**A.     COUNT ONE: DECLARATORY/INJUNCTIVE RELIEF (BY ALL PLAINTIFFS AGAINST DHS)**

1.     Plaintiff and Class Plaintiff reasserts allegations above as if fully set forth herein.

2.     DHS's campaigns against FRS providers constitute violations of the *Jensen* settlement, the *Olmstead* plan, and related state and federal statutes.

3.     Plaintiffs and Class Members are therefore entitled to declaratory judgment that DHS's actions are unlawful and injunctive relief barring DHS from continuing its campaign to destroy FRS providers as a placement option for eligible vulnerable adults.

4.     Class Plaintiff and Class Members are also entitled to a permanent injunction compelling DHS to comply with Minn. Stat. § 245A.04, subd. 6, when conducting all licensing-related investigations and when making subsequent licensing decisions.

26

5. Class Plaintiff and Class Members are also entitled to reappointment of a court monitor under Fed. R. Civ. P. 53 to ensure ongoing compliance with the *Jensen* settlement.

6. Class Plaintiff and Class Members are also entitled to an award of costs and reasonable attorney's fees under Fed. R. Civ. P. 23(h).

**B.   COUNT TWO: BREACH OF CONTRACT (CLASS ACTION BY ENGMAN AGAINST DHS)**

6. Class Plaintiff reasserts allegations above as if fully set forth herein.

7. The *Jensen* settlement, including its requirements for statutory and policy changes pursuant to the *Olmstead* plan, constitutes a binding contract, under which Class Members are intended third-party beneficiaries.

8. DHS has violated the *Jensen* settlement by failing to comply with its provisions requiring that Class Members be placed in the most integrated setting and that they be given a substantive voice in choosing the locations at which they are to receive services for which they are eligible.

9. As a result of DHS's numerous breaches of its contractual obligations, Class Members have been damaged in an exact amount to be determined at trial.

**C.   COUNT THREE: VIOLATION OF TITLE II OF THE AMERICANS WITH DISABILITIES ACT (CLASS ACTION BY ENGMAN AGAINST GANDHI INDIVIDUALLY)**

10. Class Plaintiff reasserts allegations above as if fully set forth herein.

11. DHS is obligated to provide treatment, support, and services to Class Members consistent with the Americans with Disabilities Act (ADA) and implementing regulations.

12. DHS's conduct in deliberately and systematically refusing to comply with post-*Jensen* requirements for providing Class Members with a substantive voice in their own care and placements violated the ADA.

13. GANDHI is individually liable for DHS's actions because DHS's actions reflect the policy and/or custom of DHS under GANDHI's individual direction, as evidenced by DHS's attempts to implement its violations of the ADA by lobbying the legislature.

14. Alternatively, GANDHI is individually liable for DHS's actions because she has shown deliberate indifference to DHS's conduct over an extended period of time involving numerous administrative appeals where GANDHI has been provided actual and/or constructive notice of DHS's violations.

15. Alternatively, GANDHI is individually liable for DHS's actions because she has failed to remedy DHS's violations over an extended period of time involving numerous administrative appeals where GANDHI has been provided actual and/or constructive notice of DHS's violations.

16. Qualified immunity does not apply because the *Jensen* settlement clearly establishes DHS's obligations.

17. Class Plaintiff and Class Members are therefore entitled to an award of damages in an exact amount to be proven at trial.

18. Class Plaintiff is also entitled to an award of costs and reasonable attorney's fees under Fed. R. Civ. P. 23(h), 29 U.S.C. § 794a(b) and 42 U.S.C. § 1988(b).

**D.     COUNT FOUR: VIOLATION OF MEDICAID ACT (BY MARSH AGAINST GANDHI INDIVIDUALLY)**

19. MARSH reasserts allegations above as if fully set forth herein.

20.     FRS providers are Medicaid providers under the Medicaid Act, 42 U.S.C. § 1396, *et seq.* and have standing to challenge DHS's rate-setting procedures under 42 U.S.C. § 1983.

21.     MARSH has associational standing to assert claims on behalf of Minnesota FRS providers.

22.     DHS is obligated to provide reimbursements to Medicaid providers using a rate-setting process that complies with the substantive and procedural requirements of the Medicaid Act and its implementing regulations.

23.     DHS's conduct in establishing limits on AFC/FRS reimbursement under the DWRS system through its application of the "primary caregiver" requirement failed to substantively comply with 42 C.F.R. § 447.253 because it resulted in a rate that was not reasonable and adequate to meet the costs that must be incurred by efficiently and economically operated providers to provide services in conformity with applicable State and Federal laws, regulations, and quality and safety standards.

24.     DHS's conduct in imposing the "flat-rate system" failed to comply with the procedural requirements of 42 U.S.C. § 1396a(a)(13)(A) by, without limitation, failing to provide affected AFC/FRS providers a reasonable opportunity to review of the basis and proposed justifications for the rates established, especially in light of the ultimate prohibition on rate exceptions for AFC/FRS providers.

25.     DHS's conduct in imposing the "flat-rate system" failed to comply with the substantive requirements of 42 C.F.R. § 447.253 because it resulted in a rate that was not reasonable and adequate to meet the costs that must be incurred by efficiently and economically operated providers to provide services in conformity with applicable State and Federal laws, regulations, and quality and safety standards.

26.     DHS's "flat-rate system" for reimbursing AFC/FRS providers is also arbitrary and capricious in that it arises from DHS's desire to eliminate AFC/FRS facilities and escape the provisions of the *Jensen* settlement agreement rather than a reasonable calculation of the costs that must be incurred by efficiently and economically operated AFC/FRS providers.

27.     MARSH is therefore entitled to a permanent injunction barring GANDHI from implementing or further applying the flat-rate system and requiring that GANDHI restore AFC/FRS providers to the DWRS rate-setting system as it existed prior to DHS's economic campaign against AFC/FRS providers.

28.     MARSH is also entitled to an award of reasonable attorney's fees under 42 U.S.C. § 1988(b).

**E.      COUNT FIVE: VIOLATION OF MEDICAID ACT (CLASS ACTION BY ENGMAN AGAINST GANDHI INDIVIDUALLY)**

29.     Class Plaintiff reasserts allegations above as if fully set forth herein.

30.     DHS's noncompliance with the *Jensen* settlement agreement, including but not limited to its campaigns against AFC/FRS providers, violates the Medicaid Act by failing to provide adequate choices to service recipients, in violation of 42 U.S.C. § 1396n.

31.     GANDHI is individually liable for DHS's actions because DHS's actions reflect the policy and/or custom of DHS under GANDHI's individual direction, as evidenced by DHS's attempts to implement its violations of the ADA by lobbying the legislature.

32.     Alternatively, GANDHI is individually liable for DHS's actions because she has shown deliberate indifference to DHS's conduct over an extended period of time involving numerous administrative appeals where GANDHI has been provided actual and/or constructive notice of DHS's violations.

33.    Alternatively, GANDHI is individually liable for DHS's actions because she has failed to remedy DHS's violations over an extended period of time involving numerous administrative appeals where GANDHI has been provided actual and/or constructive notice of DHS's violations.

34.    Qualified immunity does not apply because the *Jensen* settlement clearly establishes DHS's obligations.

35.    Class Plaintiff and Class Members are therefore entitled to an award of damages in an exact amount to be proven at trial.

36.    Class Plaintiff is also entitled to an award of costs and reasonable attorney's fees under Fed. R. Civ. P. 23(h) and 42 U.S.C. § 1988.

## F.    COUNT SIX: DECLARATORY/INJUNCTIVE RELIEF (STATE-LAW CLAIM BY ENGMAN INDIVIDUALLY AGAINST DHS)

37.    Plaintiff reasserts allegations above as if fully set forth herein.

38.    DHS's denial of crisis-respite services and its threat to remove ENGMAN from his home without consultation with or consideration of ENGMAN's own preferences about where he is to receive eligible services threatens to violate Plaintiff's rights under the *Jensen* settlement, the *Olmstead* plan, and statutes and regulations implementing Minnesota's obligations thereunder.

39.    Plaintiff is therefore entitled to declaratory judgment that DHS's determination is unlawful, temporary and injunctive relief barring DHS from using substantively similar grounds to deny him crisis respite services at SFFS, and a permanent injunction requiring that DHS to approve a service plan allowing him to receive crisis respite services at SFFS.

40.    Plaintiff is entitled to relief notwithstanding the purported availability of administrative remedies because (1) the intervention of high-level DHS officials like Maki into

31

ENGMAN's individual case without any attempt to comply with requirements to consult with ENGMAN himself, combined with DHS's overall pattern of ignoring its obligations to consult with vulnerable adults about their own care, justifies the inference that administrative remedies are illusory and (2) because DHS has irreparable harm is likely to occur before any administrative remedy could be effective.

41.     Plaintiff is also entitled to an award of reasonable costs and reasonable attorney's fees under Minn. Stat. § 555.10.

**PRAYER FOR RELIEF**

Plaintiff respectfully requests that the Court:

(1)     Issue an Order certifying ENGMAN as class representative and his counsel as class counsel under Fed. R. Civ. P. 23;

(2)     Declare that DHS has failed to comply with its obligations to Class Plaintiff and Class Members under the *Jensen* settlement agreement, including its obligations under Minnesota statutes and rules implementing the *Jensen* settlement agreement;

(3)     Reappoint a monitor under Fed. R. Civ. P. 53 to ensure DHS's ongoing compliance with the *Jensen* settlement agreement;

(4)     Permanently enjoin DHS from continuing its campaign to destroy FRS facilities;

(5)     Permanently enjoin DHS from continuing implementation or use of the "flat-rate system" and requiring that DHS return to the DWRS rate-setting system that existed prior to DHS's campaigns against AFC/FRS facilities, including restoring FRS eligibility for rate exceptions;

(6)     Award Class Plaintiff and Class Members compensatory, consequential, and special damages in an exact amount to be determined at trial;

(7)     Award Class Plaintiff reasonable costs and attorney's fees under Fed. R. Civ. P. 23(h);

(8)     Award ENGMAN and MARSH reasonable attorney's fees under 42 U.S.C. § 1988(b).

(9)     Declare that DHS's denial of ENGMAN's crisis-respite services at his present placement at SFFS would violate ENGMAN's rights under Minnesota law and the *Jensen* settlement agreement;

(10)    Enjoin DHS from denying ENGMAN crisis-respite services at his present placement at SFFS;

(11)    Award ENGMAN attorney's fees under Minn. Stat. § 555.10;

(12)    Award Plaintiffs taxable costs and disbursements incurred in this action;

(13)     Award Plaintiffs prejudgment and postjudgment interest at the highest lawful rates; and

(14)    Award Plaintiffs such further relief as Plaintiffs may be entitled and which the Court deems just and proper.

Dated:     6/22/2026             /s/ Jason Steck
                                Jason Steck #0393077
                                Attorney for Plaintiff
                                6160 Summit Drive North, Suite 220
                                Brooklyn Center, MN 55430
                                jason@jasonstecklaw.com
                                (763) 402-1829